R. Waldron Herzberg, J.
The petitioners in these five article 78 proceedings seek to review the action of the Board of Regents and reverse the orders of the Commissioner of Education made on the 29th day of May, 1962 directing that the licenses of petitioners to practice medicine and their registrations as physicians “be and the .same hereby are cancelled” upon the ground they were “ issued in error.”
The records of the Board of Regents indicate that each of the five petitioners initially failed to receive passing grades of 75 in either one or more of the required subjects on their written examination papers. Furthermore an inspection of these records’ discloses that the failing grades were subsequently raised to a passing mark of 75 after which, in due course, the Commissioner of Education issued licenses to practice medicine to the petitioners and registered them as physicians.
The evidence establishes that none of the petitioners took part in the raising of the grades or had any knowledge of the unauthorized changes made by a former employee of the State Department of Education. Moreover, it is undisputed that the Commissioner of Education canceled the licenses without prior notice to petitioners and without affording them hearings.
Petitioners argue that the respondents had neither statutory authority nor inherent power to cancel a license for an error *270 committed solely on their part. Moreover, they contend, even assuming an inherent power to correct an error exists, the respondents could not lawfully cancel a license once issued without granting the licensee a hearing. On the other hand the respondents claim that the right of the Board of Regents to correct their own errors or mistakes or those of their subordinates is not only inherent in their authority but does not require prior notice to the licensee and a hearing before action on their part.
The law of this State is clear that the. Board of Regents has an inherent power to correct an error or mistake even after a license has been issued. In People ex rel. Finnegan v. McBride (226 N. Y. 252, 258-259) Pound, J. speaking for a unanimous court wrote: “ The action of the commission [Civil Service Commission of the City of New York], had with due deliberation, upon such a matter as the establishment of an eligible list, should, for obvious reasons, be regarded as a finality, but the commission’s authority thereon does not wholly cease. It certifies names therefrom for appointment. Error may be corrected by setting it aside if it was the result of illegality, irregularity in vital matters, or fraud. The commission may not act arbitrarily. Public officers or agents who exercise judgment and discretion in the performance of their duties may riot revoke their determination nor review their own orders once properly and finally made, however much they may have erred in judgment on the facts, even though injustice is the result. A mere change of mind is insufficient. Further action must, where power is not entirely spent, be for cause, with good reasons and proper motives for the correction of improper action. The commission has life and power to vacate a list which has no legal virtue whatsoever ” (emphasis added).
However this authority in the Board of Regents to correct errors or mistakes if “ the result of illegality, irregularity in vital matters, or fraud ’ ’ did not empower this administrative body to cancel the licenses of petitioners, who were guilty of no wrongdoing, to practice medicine, except in conformity with due process. The cancellation of the licenses to practice medicine in the instant matters not only precluded petitioners from earning a livelihood, but also destroyed their vested property rights in the continuation of their profession. Due process required that each petitioner should have been fully apprised of the claimed irregularities, if any, and of the evidence to be considered, and should have been given the opportunity to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal. (Matter of Hecht v. Monaghan, *271 307 N. Y. 461, 470). “ A fundamental requirement of due process is ‘ the opportunity to be heard ’. * * * It is an opportunity which must be granted at a meaningful time and in a meaningful manner ” (Armstrong v. Manzo, 380 U. S. 545, 552).
The failure of the Board of Regents to grant hearings to petitioners necessitates the annulment of the orders made by the Commissioner of Education canceling the petitioners’ licenses to practice medicine and their registrations as physicians.
The determination that the orders of the Commissioner canceling the licenses of petitioners to practice medicine must be annulled necessitates a review of the general medical qualifications and background of each petitioner so that a decision can be made whether these proceedings should be remanded to the Board of Regents for further hearings.
(1) Dr. George Haynal
Dr. George Haynal was born in Hungary on December 7, 1913. After preliminary schooling in Budapest, he attended and graduated in 1938 from the Medical School of - the Royal Hungarian Peter Pazmany University which included a one year internship. Thereafter he first served, as a surgical resident at the Central Hospital of the Hungarian National Health Insurance Institution. In 1943 he was appointed Associate Director of Surgery at the Trauma Hospital in Budapest. In 1947 Dr. Haynal became a Diplómate-of the Hungarian Surgical Board. After his appointment as a'Diplómate, Dr. Haynal became a full-time Assistant Professor of Surgery at the Medical School of Budapest. This petitioner testified that from 1940 to 1955 he performed between 2,500 and 3,000 major operations, delivered many lectures and published numerous articles on surgical matters including “ The Principles of Traumatic Surgery.”
The Communist take-over in Hungary forced Dr. Haynal to flee his native land. He arrived in the United States on April 14, 1957. Shortly thereafter he took a position in a hospital in Boonton, New Jersey, where he remained two months. Then he became associated with the South Nassau Community Hospital as a physician, where he remained for two and a half years.
Dr. Haynal took the December, 1960 New York State licensing examinations. On February 20,1961 he learned from Dr. Ezell, the Secretary of the Board of Medical Examiners, that he had passed. A license to practice medicine was thereafter issued.
After receiving his license, Dr. Haynal rented and furnished *272 an office in Kew G-ardens, received an appointment as an Assistant Visiting Surgeon at Bellevue Hospital in New York City and the privilege to practice major surgery at the Kew G-ardens Hospital. He has continued to practice his profession part of the time as a resident surgeon at the Downstate Medical Center, Kings County Hospital in Brooklyn. Six physicians have submitted either letters or affidavits vouching for Dr. Haynal’s competence as a doctor and good character at the present time.
(2) Dr. Andrew J. Lappas
Dr. Andrew J. Lappas, who appeared at the trial without an attorney, testified that he was born in 1924 in Athens, Greece; that after attending elementary school and high school, he matriculated in medical school from which he graduated in 1952; and that after graduation he served a one-year internship at a hospital in Athens.
Dr. Lappas arrived in this country in June, 1953. After his arrival he served a one-year internship at St. John’s Long Island City Hospital and two years as a resident in medicine at -St. Mary’s Hospital and the Jewish Chronic Disease Hospital, both in Brooklyn. From July 1, 1956 until the end of June, 1957 he was employed as a house physican at the King’s Highway Hospital in Brooklyn. In order to qualify for the licensing examinations of this State, Dr. Lappas took postgraduate courses at the Polyclinic Medical School (1957-1969), working nights at the Cumberland Hospital in Brooklyn.
Dr. Lappas first took the licensing examinations in June, 1959; next in December, 1959; and finally in June, 1960. He learned in September, 1960 that he had passed. A short time thereafter a license was issued to him.
Since receiving his license Dr. Lappas has engaged in the general practice of medicine in this State and obtained licenses to practice medicine in Virginia and Connecticut after passing licensing examinations in those States.
(3) Dr. Marvin D. Bergman
Dr. Bergman testified that he was born in New York City on February 8, 1931. He graduated from the School of Pharmacy at Fordham University on June 13,1951. After he had successfully passed the licensure examinations for the practice of pharmacy in this State, petitioner matriculated in the Medical School of the University of Lausanne in Switzerland from which he graduated in 1958 with the degree of Doctor of Medicine.
*273 On his return to the United States in January, 1959 Dr. Bergman became associated with the Morrisania City Hospital in New York City as an interne for one year. He then transferred to Beth Israel Hospital where he was a resident in anesthesiology for five and a-half months and a resident in internal medicine for 11 months.
Dr. Bergman took the licensure examinations in medicine in June, 1960; he received notice that he had passed on September 26, 1960; and his license to practice medicine was issued shortly thereafter.
Oh July 1,1960 petitioner took and passed examinations given by the Educational Council for Foreign Medical Graduates covering the same subjects propounded by the Board of Medical Examiners.
On April 6, 1961 Dr. Bergman was called to active duty in the Armed Services with the rank of Captain. He was assigned to the Noble Army Hospital at Fort McClellan, Alabama where he served as Assistant Chief of Medicine until shortly before his separation from the service on April 6,1963.
While serving his country, he learned through the newspapers that his license to practice medicine had been canceled.
After his separation from the service, Dr. Bergman first .settled in Naples, New York, where he practiced general medicine for nine months. In January, 1964 he became associated with the E. J. Barber Hospital in Lyons, New York as an anesthesiologist. Since then he has administered anesthesia at the E. J. Barber Hospital for approximately 500 operations a year, performed the cardiology at the hospital, read and interpreted the electrocardiograms and maintained a private practice of medicine.
Several physicians and citizens of Lyons and neighboring towns have submitted letters indorsing not only Dr. Bergman’s qualifications as a doctor of medicine but also his good character.
(4) Dr. Irene May Fono
Dr. Fono testified that she attended the University of Sciences, Elizabeth Queen of Hungary from which she received the degree of Doctor of Medicine on July 16, 1927.
Between 1927 and 1956, when she fled Hungary, Dr. Fono practiced medicine either as a private practitioner or as an employee of State’s hospitals or companies. From 1927 to 1931 Dr. Fono practiced at St. Rokus Hospital in Budapest specializing in gynecology and obstetrics; practiced internal medicine at St. Stephen Hospital between 1931 and 1934; engaged in the general practice of medicine in Magyarovar between 1934 and *274 1944; acted as chief physician at the ont-patient clinic in Pesterzsebet, a suburb of Budapest, between 1944 and 1951, specializing in obstetrics and gynecology and examining 40 to 50 patients a day; became physician at the infirmary of a factory between 1951 and 1953, where she treated 20 patients a day; became supervisor of the general practitioners for 10 districts of the State Insurance Program with headquarters at the St. Janos Hospital in Budapest; and was transferred in March, 1956 to the position of chief physician in the out-patient clinic at Madach Square in Budapest.
After Dr. Pono arrived in the United States in 1956, she took a position at the Central Islip Hospital on Long Island where she treated mental patients. Thereafter Dr. Pono took and\ passed civil service examinations for the positions of senior psychiatrist and supervising psychiatrist.
Dr. Pono took the medical licensure examination in December, 1959, June, 1960 and December, 1960. On March 5, 1961 she received a license to practice medicine in this State.
Por the past 13 years Dr. Pono has been employed by the State of New York. At present she works as a psychiatrist at Letch-worth Village with 200 patients under her immediate care.
(5) Dr. Andrew Antypas
Dr. Antypas testified that he was bom in Corinth, Greece on February 2,1923; that after attending preliminary school and high school, he matriculated in the Chemical School of the University of Athens in 1942; that after one year at the Chemical School, petitioner transferred to the Medical School where he ■ spent seven years, including one year of internship; that he did not receive his degree of Doctor of Medicine until June, 1952 by reason of his tour of duty in the army for three years during the revolution in Greece.
In January, 1953 Dr. Antypas came to the United States with his wife. He immediately began intensive study to learn the English language. Between June 19, 1953 and December, 1960, when he took the licensing examinations, Dr. Antypas received practical experience in the practice of medicine at the Unity Hospital in Brooklyn (June 15, 1953 — June 14, 1954), Goldwater Memorial Hospital (one year), Queens General Hospital (two years), Hospital for Crippled Children of Newark, New Jersey (one year) and Polyclinic Hospital (one year).
_ In February, 1961 petitioner learned that he had passed his licensing examinations. After receiving his license, he joined the Queens County Medical Society, worked in the emergency *275 ward of the Queens General Hospital as admitting physician, practiced medicine at the Union Health Center and conducted a general practice of medicine from his office in Jamaica, Long Island.
Ten doctors have submitted letters vouching for Dr. Antypas’ integrity and qualifications to practice medicine.
The testimony and exhibits reflecting the educational backgrounds in the field of medicine of these five doctors and their many years of experience in the practice of medicine together with the affidavits and letters submitted by their fellow physicians vouching for their medical ability and good character lead to the inescapable conclusion that the petitioners at the present time are qualified to practice medicine in this State. In view of the excellent records of these petitioners in their profession by reason of court-issued stays since the cancellation of their licenses in 1962, and the lack of any evidence connecting them with any irregular practices by any employee of the Board of Regents in the grading of examination papers, these proceedings need not be remanded to the hoard for further hearings. Since.the majority of the questioned examination papers are no longer in existence, the clock cannot be turned hack 10 years without great prejudice to several of these petitioners. These proceedings should be terminated sine die in the best interests of the parties to this litigation and the people of this State.